Next case on the oral argument calendar, Pulido v. Gonzalez. Good morning. May it please the Court, my name is Valerie Wagner, counsel for petitioner Jorge Pulido. And if possible, I'd like to reserve three minutes, unless the Court has questions at the end, for a rebuttal. This case involves, as the briefs clearly set forth, a taxi driver from Mexico City who brought a petition under the Hague Convention on the Civil Aspects of International Child Abduction and the U.S. counterpart to that, the International Child Abduction Remedies Act, commonly known as ICARA. And this case, in terms of how it played out at the district court level, really embodies everything that should not happen when a parent from a foreign country seeks return of their children pursuant to the Hague Convention and ICARA in the United States. In this proceeding, the underlying policies and presumptions of the Hague Convention were really turned on their head. There was no interest in promoting comedy between the nations and preventing the abducting parent from shopping for a more favorable forum where the other parent would be at an inherent disadvantage. Petitioner's evidence was excluded improperly. The law of the children's habitual residence, Mexico, was disregarded and misapplied, as the government of Mexico itself agreed in its amicus briefing. The petitioner was in a foreign country confronting a foreign legal system in a foreign language. So he started from a disadvantage, and it only got worse as the case progressed. His witnesses could not be physically present because they were not able to travel legally to the United States, and yet their declarations were excluded, even though the district court had indicated it was likely to allow at least one of them. And despite the Hague Convention's liberal evidentiary standards that are in place precisely for situations such as this, the Respondent, on the other hand, had her family present, she had a sympathetic forum, and she had the ability to make allegations that had never been raised before in the past that forced the petitioner to constantly have to rebut negatives that should not have been his burden of rebutting in the first place. First, he was improperly forced to prove a negative, that he did not give up the rights to his children based on a perjured and legally insignificant declaration presented by the Respondent and shown to Petitioner for the very first time in these proceedings. He was, again, essentially forced to prove a negative that he did not abuse his children, either physically or sexually, even though the children never had a voice in the proceeding and the psychological evaluation of them by an independent psychologist was inconclusive at best. Now, this Court, the Ninth Circuit, has directed district courts to apply the Article 13b defense to the return of a child under the Hague Convention due to the grave risk of harm. The Ninth Circuit has directed district courts to apply that exception very narrowly and to focus on the fact that harm that could occur in the immediate future and, notably, even if there is such a grave risk of harm found, the district court must, not may or might, but must consider any and all available undertakings that would allow the children to return safely to their home country of habitual residence. Now, in this case, the only corroboration for Respondent's stories of abuse, abuse of the children, were from her teenage daughter from a previous marriage. And this teenage daughter testified that one of the reasons she came forward with her own stories of abuse for the first time during these proceedings was because she believed it was unfair, not dangerous, not horrifying, but unfair for the petitioner to come to the United States and try and seek return of the younger children back to Mexico. The evidence showed that the petitioner was under oath and that her teenage daughter, petitioner's stepdaughter, was at best an unreliable and contradictory witness who came forward with her own stories for the first time during these Hague Convention proceedings. Nothing, however, indicated any immediate risk of harm to the two younger children. And Respondent has acknowledged this in several key ways. Before she left Mexico with the children, she allowed the petitioner to take them on vacation without her during a time period when they were, the couple was separated, and also notably during a time period when she claims the petitioner had forfeited his parental rights. Again, when the petitioner came to the United States, she allowed him to, or he had custody of the children, physical custody of the children, for three weeks, during which Respondent was in repeated contact with the district attorney's office in San Mateo and yet never mentioned any concerns about the safety of the children. And in fact, she said she was not surprised that they were so happy to see Petitioner, because he was, after all, their father. In short, Respondent did not establish any grave risk of immediate harm to the children based on their return to Mexico. But even if she had, even if she had, the district court ignored this Court's directive in the Gowden v. Remus case and refused, outright refused, to consider any undertakings that might allow the children to return safely to Mexico. Now, this case on its whole ---- In your view, is it the district court's obligation to try to find ways a child can return, or is it the obligation of the petitioner to present some suggestions about how the children can be returned, et cetera? Is it supposed to become inquisitorial justice at that point, either the district court, or are we still in our adversarial system where the petitioner is supposed to be presenting something? It could be either answer. It is a treaty, after all. Well, I think that this Court's decision in Gowden v. Remus can certainly be interpreted to require a more active role for the district court in terms of considering available options. In this case, however ---- Sure, but how is he going to consider available options? That's really the problem. How does the Court go about considering available options? Outside the record? Own research? Send Lawcrook off to the Internet? I mean, how is the Court supposed to do that? That's the question. Well, Your Honor, in I believe it was the Blondin case, the district court did do in a proactive investigation itself contacting judicial authorities in the home country. Must it? That's my question. Well, here the petitioner had presented several available options, which the Court found it did not even need to consider. The petitioner also indicated that a divorce proceeding had been initiated in Mexico such that there was an open file and a judge who could certainly have entered any interim custody arrangements, which petitioner testified under oath he would abide by. And everything in his conduct throughout the course of the case ---- He said he would if he were ordered not to see the children, he'd abide by that? He said that? Yes, he did, Your Honor. He also said that he expected to be involved in their discipline, et cetera, no matter where they were. Well, I think on clarification, he was asked on redirect, if you were ordered to have no contact with the children during this time, would you abide by that order? And he said yes, he would. Precisely. I think that's what we just said. Yes. That was actually a follow-up redirect question after he was asked whether he would still expect to have some role in their upbringing and discipline. Right. So I think they're really ---- this Court has indicated in Gowden that it is not simply a matter of having a taxi driver from Mexico enter conclusive evidence about exactly what a court in Mexico would or would not be willing to do. And I think that the body of case law involving undertakings indicates that there is often a dialogue between the court in the United States and the home jurisdiction about what might be done to ensure this. And the Court's directive, this Court's directive in Gowden indicates that the district courts must consider any, any available undertakings that might ensure the children's safety pending a full custody determination in the home country. The district court here, however, opted instead to make its own custody determination, essentially terminating Petitioner's rights to play any meaningful role in his children's lives. As he cannot live legally in the United States, he does not have the means to travel frequently to the United States, even if he could. And so what ---- The district court hadn't made any determination of that type. The district court can't and couldn't make any custody determination. If this case stands as it is now, what it means is that the Petitioner has to fight out his custody question in the California state courts. I take it. Which have already shown some inclination towards him, by the way, but that's neither here nor there. Isn't that right? I mean, this isn't a custody determination, is it? No, but I think that the case law concerning the Article 13b defense to the return of a child to the home country ---- That's not the point. You said that he will not be able to have custody of his children. I think it would be on a practical basis virtually impossible, yes, due to his immigration status and due to his financial means. The evidence was uncontroverted that this was a couple who did not have extensive financial resources, and this was part of their problem. But I think that ---- He's had representation. And what you're assuming is that if the case is put before a California, for example, family court judge, they still call him a family law judge, the judge will say, oh, yes, the mother should have custody and the children should remain in the United States. That's just an assumption about what the family law court would decide. It could decide, no, he should have custody, the children should be in Mexico or they should have shared custody, they can go back and forth, whatever. Isn't that right? You're making a lot of assumptions about what the end of this custody battle is going to be. Our only question is where will it take place, true? Not exactly, because the policies behind this section of the Hague Convention and the cases that have interpreted it caution strongly that this exception to the return could end up swallowing the entirety of the convention itself if the court takes such an approach to it that it is de facto making a custody determination. That is why courts, including the Ninth Circuit Court of Appeal, have cautioned district courts to apply this exception very narrowly and to consider possible undertakings that might mitigate any risk of harm such that the children can still be returned. And I think that is due to a recognition, number one, that a foreign national should not be placed at a functional disadvantage by having to litigate in a foreign country for custody of his or her children simply based on a showing that is insufficient under the Hague Convention itself. How do you deal with the district court's alternative finding that the Petitioner not met his burden of proof on undertakings? Well, Your Honor, the first of all, I think that any of that would have been essentially dicta, because the district court made it clear it didn't believe it had to consider any available undertakings, but also No, but then it goes on to say even if there is a requirement to consider undertakings, and it goes on, the court goes on to reject it. It's an alternative holding. So how do we deal with that? Well, I think that the district court's finding in that regard was incorrect to the extent it made one. Petitioner indicated that he would be fine with having the children return in the Respondent's custody to having her have temporary custody pending a full custody determination in a Mexican court. It was okay with him, he testified, for them to stay with Respondent's family. Right, but then the district court was concerned about the lack of an enforcement mechanism, right? Yes, Your Honor, but I think that the Hague Convention does not allow a district court to just de facto reject the ability of a foreign judicial, legal, and social services system to account for that. In fact, the Hague Convention mandates that the What he said was, not that, it wasn't questioning the ability of the courts, he said how would that be enforced in Mexico, and the answer was none. There was no answer, according to the district court. Well, Your Honor, as I recall, the possibility was put to the court of having a return order conditioned upon the entry by a Mexican court of a temporary custody arrangement pending a full-blown custody determination. Which is considered an insult to the foreign country. I think that's one court's approach to that. I don't think that has been traditionally the Ninth Circuit's approach to that. I don't think that the court in Gouden would have made the mandate that it made to the district court in that case if it felt that there was no practical way that an undertaking could ever be enforceable. If that were the case in this district, then the court's ruling in Gouden would have no real effect. No, but I mean, Gouden says the district court has to consider it, and the district court first said it didn't want, it wasn't going to consider it here, but then, but if I do, you haven't met your burden. I mean, how are we supposed to deal with that on appeal in terms of a deferential standard of review on this issue? Just a burden of proof issue. Well, I don't think it's just a burden of proof issue, Your Honor. Why not? I think it's an application of the law to the facts, which this court can certainly address de novo. Well, here's what the, I mean, what the district court did, at least as I read it, is it said, okay, in considering the alternatives, here's what's been offered, here's why I reject them. Are you suggesting we should reweigh that de novo? Yes, Your Honor. Why? I think so, because otherwise this court's directive in Gouden would be meaningless, that the court could not actually ever find a way for an undertaking in a foreign country to be meaningful in any sense. I think you're reading a little too much into Gouden, because Gouden says we did not prejudge the district court's decision on remand. It just said to consider it. That is correct, Your Honor. But it remanded with a directive that the court give full due consideration and made it mandatory that it do so. And if there were essentially a catch-22 such that there were no meaningful undertakings that could ever be enforceable or have teeth in a foreign jurisdiction, then that remand would have been meaningless. Thank you, Counsel. Thank you. May it please the Court, good morning. My name is Drexel Branch. I represent the appellee Maribel Gonzalez-Gonzalez. I want to address the contention by my colleague that this proceeding in the district court was everything that should not happen under a case of this type. In fact, what happened was everything that should happen. The first question addressed by the court was whether the father of these children had parental authority of any sort, because absent parental authority, the inquiry stops there. There's no need for further inquiry. There were two Mexican Code sections submitted in evidence accepted by the district court that indicated parental authority had been suspended by the filing of the declaration filed by Ms. Gonzalez, that custody or guardianship is suspended by a declaration of absentia. There need be no further inquiry beyond that. Well, if we decided that the district court erred in not considering the additional authorities offered on the motion for reconsideration, we put that as part of the evidentiary picture in this case, is your answer still the same? My answer would be on that point, that the district court properly excluded them on reconsideration. No, I'm asking you a hypothetical. If we say the district court, assuming hypothetically that we decided that the district court improperly excluded that evidence, we take into consideration that evidence, is your answer the same? I believe that the law was less than perfectly clear as to the father's parental rights, even considering the evidence submitted by the petitioner on reconsideration. In a light most favorable to him. There was no opportunity for my client, for example, to present additional authority. I understand your procedural point, but I just found it striking that in none of the briefs on this case that really contested that that was the law. I mean, you seem to be conceding, if I'm understanding it correctly, that in fact the submissions were proper. Am I right? I don't mean properly procedurally, but that, in fact, that's what the law of Mexico was on this issue. And I apologize to the Court. I don't practice law in Mexico. I don't have access to that authority. And so I'm unable to address that. Okay. Well, if it is, let's assume, again, for the sake of argument, that the submissions were a correct statement of the law in Mexico, your answer is it's just not clear, right? Yes, sir. So he may have had custodial rights. We don't know. That's correct. But we can then turn to the vast body of evidence that was really the true subject of inquiry before the district court. And that dealt with the factual findings of the grave risk of harm to these children should they be returned to Mexico. The district court made distinct factual findings that the respondent was credible, that her daughter was credible, that the doctor, having examined the children, was credible, and made specific factual findings that the petitioner himself was not credible, that he lost control of his emotions frequently, and that he was inconsistent in his testimony. He made specific findings that these children had been abused and would likely be subject to abuse should they be returned to Mexico. Well, if you look at the record, if I'm reading it correctly, he didn't hit them, right? Yes, sir, he did. Well, I'm reading, I'm just going through the testimony, and they say, did he hit Fernanda? I don't know. Maybe he pulled her hair. And it goes on to talk about hair pulling. I don't see any testimony about him hitting her. I believe there's also testimony from one of the witnesses regarding a fly swatter. The fly swatter, that's true. But, I mean, in terms of physically assaulting with a fist, there's no testimony in that, right? We've got the fly swatter in the car. We have hair pulling. What else? We have picking her up and throwing her on a bed. We have locking her in a closet. We have putting her under a cold shower. And we have a pattern of abuse by a man easily angered and easily most prone to controlling the environment in which he surrounds himself, controlling his children, controlling his wife. And there was ample testimony that the mother had been subject to abuse that was witnessed by the children. That alone constitutes a grave risk of harm exception, subject to the children need not be returned to the home country. Well, what do we make of the evidence that, in fact, the father did take the children for some period of time without incident during the point when, I guess, she was considering a marriage? She allowed the father to take the children on vacation? I wouldn't begin to speculate, Your Honor, as to what was meant by that. Perhaps there was no evidence before the district court as to why that had occurred specifically other than she had permitted it to happen. Perhaps she had permitted it to happen because she was under his dominion and control in that abusive environment. Perhaps it occurred because he threatened her. Perhaps it occurred voluntarily. But that three-week isolated time frame wasn't the totality of the circumstances presented to this family. As to the availability of undertakings, I'd like to address that. That is subject to review based only on clear error. And I have to agree with the Court that they're not the district court was not obliged to do its own independent search to ascertain what undertakings might possibly protect these children from harm from this person who was established by the district court to be abusive and not only physical but sexual in nature. In essence, the Petitioner utterly failed to meet his burden, and he presented no position, no possible scenario under which the district court could be assured that these children would be safe upon their return to Mexico pending a formal custody determination by a Mexican court. Moreover, this record has not been supplanted with any custody order arriving out of the Mexican court related to these children, nor has the Petitioner made any efforts to gain visitation or custody rights in the California court, where there is also presently a pending Del Milo case. Why is that relevant? I'm sorry? Why is that relevant here? He hasn't sought to have a relationship with his children. What he sought to do is reverse a decision by a district court that made ample factual findings that he was abusive, that he presented a risk of harm to these children, and accordingly that they should not be returned to him. If the Court doesn't have any questions, I'll defer the balance of my time to the attorney for the minor. Okay. Thank you. Good morning, Your Honors. Bonnie Miller appearing on behalf of the FLE's minor children. I would just say, Your Honor, that in considering the grave risk, the Court must consider the best interests of the children, and I believe that the district court did that. He considered the evidence that was the abuse of numerous individuals, his wife, the stepdaughter, these two children. Fernanda, in particular, was subjected to being put into the cold shower, being hit with a shoe, being hit with a fly swatter, having her hair pulled, numerous incidents of that. There's also the abuse of the mother that was observed by these children, and that alone is sufficient. Not only is there the psychological abuse of these children by observing that, but current scientific studies show that when young children observe abuse, there is a change in their brain growth. So we join in Mr. Bradshaw's argument. You know, in the normal case, I credit what you say, but the standards here are so high. That's a grave risk of abuse that has to have some aspect of immediacy to it. What do you think, on the record, points to the probability that, within the temporal framework we're talking about, that these children will be immediately subject to abuse? I think that the history of Mr. Polito and his short temper, his short fuse, all point to the fact that when angered, he lashes out. And I think that the fact that there may be a pending dissolution matter in Mexico City does not curb his anger. He has a very close relationship with his family. The record indicates that the family was unwilling to intercede on behalf of the mother and the children to protect them against the father. So I believe that there is no protection of these children if they are returned. I believe that history is the best predictor of future conduct, and Mr. Polito's conduct is very clear in the transcripts of this case. Finally, Your Honor, I think the difficulty that one wrestles with at that level is the evidence sounds an awful lot like the kind of thing that comes out of just any old custody dispute. It doesn't sound like a lot. It's hard to say, is it really grave? If we're in family law court, that's easy. But is there a higher standard here, in your view, in terms of what a grave risk is as opposed to a risk? So let's say he slaps the kids around from time to time. That's a risk, and that's not good. But are they in grave risk of abuse in the sense it's talking about here? I believe they are, Your Honor. I believe that the allegations of sexual abuse made against Mr. Polito are such that Fernanda in particular is at an age now where should she be returned to Mexico. There is the likelihood of sexual abuse by Mr. Polito. She's just about the age that her half-sibling was when she began to be abused by Mr. Polito, and I believe that that is a very grave risk of harm and that it could be immediate harm. Well, not to minimize it, but there was one episode. Were there more episodes of sexual contact with the stepdaughter? I'm sorry? I don't want to minimize it. There's one episode in the record. Is there anything more than that? There were, I believe she said there was one incident before her mother married Mr. Polito, and then there were several incidents after they were married, and she didn't specifically date those, I believe, after, but they had ceased when she was around the age of 12 or 13. And, Your Honor, I believe that the Court did consider the undertakings that were presented by Mr. Polito, and I believe that those, that the Court found those undertakings to lack protection of these children. Again, because of his relationship with his family and because of his statements on the record that he believed he should have continuing conduct and continuing participation in their discipline, that the district court determined that no one should necessarily protect these children. We would submit on that. Thank you. Okay. Thank you. We'll give you one minute for rebuttal. This Court, in its questioning concerning the evidence of purported abuse, it really hits on, I think, hit on the key point here, which is that we're dealing essentially with a dispute over the appropriateness of corporal punishment and a very insufficient record of anything more grave, serious, or immediate than that. And even the parade of family witnesses that Respondent presented could point to nothing more serious than the occasional spank on the bottom, to sending a child to his or her room, to holding a young toddler boy while he was having a tantrum, and to placing a child holding her breath under a squirt of cold water. Even the Respondent in her testimony acknowledged that this was advice the couple had received from experts in Mexico as to how to deal with their daughter's tantrums during which she would hold her breath and turn purple. And that really, I think all the discussion of undertakings is significant, but the more important question is whether there's anything approaching, showing here, of a grave risk of immediate harm. Even the Respondent's daughter, Petitioner's stepdaughter testified she had not seen any physical punishment whatsoever of her younger siblings in, I think it was four years. And so we're not dealing with anything immediate, and we're not dealing with anything that constitutes a grave risk. Therefore, the affirmative defense to the return of the children should never have been found to be established in the first place. Then, in the extent that this Court does find it was, then we move to the question of undertakings, but only in that event. And then going to the question that Your Honor raised and that Respondent's daughter testified she had not seen any physical punishment whatsoever of her younger siblings in, I think it was four years. Then, in the extent that this Court does find it was, then we move to the question of undertakings, but only in that event. And then going to the question that Respondent's daughter testified she had not seen any physical punishment whatsoever of her younger siblings in, I think it was four years. Then, in the extent that this Court does find it was, then we move to the question of undertakings, but only in that event. And then going to the question that Respondent's daughter testified she had not seen any physical punishment whatsoever of her younger siblings in, I think it was four years. Then, in the extent that this Court does find it was, then we move to the question that Respondent's daughter testified she had not seen any physical punishment whatsoever of her younger siblings in, I think it was four years. And then going to the question that Respondent's daughter testified she had not seen  or, or influence in the death penalty clause, which Respondent's counsel acknowledges requires itself an official declaration by a court of some nature. Even that only operates to suspend custody rights. When this parent is absent, it does not operate to terminate them. And the measures by which custody rights are terminated with finality are entirely different and were not raised in this particular proceeding. Thank you, counsel. Thank you. The case just heard will be submitted.
judges: Fernandez, Nelson, Thomas